**Ene RIISNA, Plaintiff,**

v.

**AMERICAN BROADCASTING COMPANIES, INC., et al., Defendants.**

**No. 01 CIV.2697 LAK.**

United States District Court, S.D. New York.

Sept. 11, 2002.

See, also, 2002 WL 188337.

Anne L. Clark, Karen Cacace, Vladeck, Waldman, Elias & Engelhard, P.C., New York City, for Plaintiff.

Kathleen M. McKenna, Lisa M. Brauner, Proskauer Rose LLP, New York City, for Defendant American Broadcasting Companies, Inc.

Steven L. Sonkin, Marshall, Conway & Wright, P.C., New York City, for Defendant H. George Brennan.

## MEMORANDUM OPINION

KAPLAN, District Judge.

Plaintiff Ene Riisna, a former ABC News producer and the dissatisfied patient of cosmetic surgeon H. George Brennan, M.D., was fired by ABC after Dr. Brennan's attorney—in what appears to have been a heavy-handed attempt to pressure Riisna into dropping a malpractice suit against him—told ABC that Riisna had used her position with the network to attempt to avoid paying for the surgery and to tarnish Dr. Brennan's reputation She here seeks to recover against ABC on the theories that her age was a factor in its decision to fire her, that ABC later refused to permit her to work as a freelance producer on an ABC program in retaliation for her having raised a claim of age discrimination, and that it slandered her by giving currency to false allegations concerning her alleged misconduct. She sues Brennan for tortious interference with her employment relationship with ABC.

Defendants moved for summary judgment dismissing the complaint. As there patently are genuine issues of fact material to Dr. Brennan's motion and the motion addressed to the age discrimination claim against ABC, the Court need not discuss them here. There remain, however, two other issues warranting a more formal disposition. Accordingly, the Court outlines the facts briefly [1] and addresses only those issues.

### Facts

Riisna was borne in 1938 and, in 1995, had been a successful producer of ABC News' "20/20" for 17 years. According to Riisna, she first met Brennan while doing a story on plastic surgeons who performed surgery *pro bono* for victims of domestic violence. The story, entitled "A Beautiful Gift," aired in January 1996.

Shortly after "Gift" aired, Riisna had Brennan perform plastic surgery on her face although she did not pay in advance for the procedure, as Brennan commonly required. Initially, she was pleased with the result. By March 1996, however, she became upset about the surgical outcome and consulted other doctors. While there is some dispute concerning the circumstances, all parties agree that Rissna never paid Brennan. It is undisputed also that Riisna arranged to have Brennan appear in another "20/20" segment during the period following surgery.

By late 1996, Riisna was sufficiently upset with Brennan that she told at least one other doctor that she would write an article and/or a book critical of him. In early 1997, she sued Brennan in a California state court for medical malpractice and battery, the latter claim based upon a contention that he performed procedures on Riisna that went beyond the surgical consent she had given.

Following the commencement of the lawsuit, Riisna wrote letters to editors of *Mademoiselle*, the *Orange County Register*, and *Harper's* that were extremely critical of Brennan. As a scheduled June 12, 2000 trial date in *Riisna v. Brennan* approached, however, Brennan struck back. He retained a New York attorney, Sean O'Shea, to contact ABC, and O'Shea did so. At a meeting between O'Shea and an ABC lawyer, Tanya Menton, O'Shea related his or Brennan's version of the Riisna–Brennan dispute. He said that Riisna had (a) told another doctor that she would drop her proposed expose of Brennan if he paid her $200,000, (b) sought to have Brennan waive payment for her surgery because of the publicity she had given him on "20/20," (c) improperly had retained a check from her health insurance carrier that was meant for Brennan, and (d) conducted a smear campaign against him. O'Shea suggested also that Brennan had defamation claims against ABC based on Riisna's statements and for negligent supervision or retention. Riisna, to be sure, contends that much of the information that O'Shea gave to ABC was false and misleading.

Following this meeting, ABC conducted an internal investigation. On May 24, 2000 Riisna was informed that ABC had concluded that she had opened ABC up to libel claims by Brennan, improperly accepted goods and services from him, and misused ABC resources. She was told that she "had a choice of resigning, in which case nothing would be said about it, or being fired for gross misconduct and having that be known." [2] Riisna asked for a few days to decide, and ABC agreed.[3] Within a very short period, according to

---

1. The account of course takes the evidence in the light most favorable to the non-moving party and are not findings with respect to disputed issues.

2. Riisna Dep. 355.

3. Riisna Aff. ¶ 50.

Riisna, she began hearing rumors from both within and without ABC that she had been fired for trading a story for plastic surgery, writing threatening letters on ABC stationery, using ABC resources, expense account fraud and insurance fraud.

On or about September 8, 2000, Riisna's present counsel informed Menton that Riisna believed that her age had been a factor in her termination. Later that fall, David Sloan, then executive producer of "20/20," told Riisna that he would like to hire her on a freelance basis to work on a Barbara Walters program. On October 26, 2000, Riisna filed an age discrimination charge with the EEOC. And on November 1, 2000, Sloan sent her an e-mail stating in relevant part that "the ABC project isn't going to [work] out, as much as I've tried. The company says that if an individual is suing us, then they're precluded from working on ABC product."

### Discussion

### A. The Retaliation Claim

 Riisna claims that ABC's October 2000 refusal to allow her to work on the Barbara Walters program was in retaliation for her protected activity in complaining of alleged age discrimination. ABC seeks dismissal on the ground that there is no admissible evidence of any causal connection between Riisna's protected activity and the decision to preclude her working on the program.

To state a *prima facie* claim for retaliation under all the relevant statutes, "plaintiff must show by a preponderance of the evidence: '[1] participation in a protected activity known to the defendant; [2] an employment action disadvantaging the plaintiff; and [3] a causal connection between the protected activity and the adverse employment action.' " [4] The only issue here is causation, a requirement that may be satisfied "(a) indirectly by showing that the protected activity was followed closely by discriminatory treatment; (b) indirectly through other evidence such as disparate treatment of fellow employees who engaged in similar conduct; or (c) directly through evidence of retaliatory animus." [5] Riisna contends that the Sloan e-mail is direct evidence of retaliatory animus. She argues also that the temporal proximity between her age discrimination complaint and the freelance incident circumstantially supports an inference of retaliatory motive, although it is not clear whether she contends that this inference is alone sufficient to require denial of this aspect of the motion. As the Sloan e-mail is dispositive of the motion to dismiss the retaliation claim, the Court addresses only that issue.

Rule 56(e) provides that "[s]upporting and opposing affidavits [on summary judgment motions] shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein." [6] Were there any doubt as to its meaning, it long ago was eliminated by a parade of decisions making clear that only admissible evidence may be considered in passing on motions for summary judgment.[7] And ABC relies on this principle,

**4.** *Slattery v. Swiss Reins. Am. Corp.*, 248 F.3d 87, 94 (2d Cir.2001) (quoting *Holt v. KMI–Cont'l, Inc.*, 95 F.3d 123, 130 (2d Cir.1996), *cert. denied*, 520 U.S. 1228, 117 S.Ct. 1819, 137 L.Ed.2d 1027 (1997)), *cert. denied*, —— U.S. ——, 122 S.Ct. 348, 151 L.Ed.2d 263 (2001).

**5.** *Carr v. Westlb Admin., Inc.*, 171 F.Supp.2d 302, 309 (S.D.N.Y.2001) (citing *DeCintio v.*

*Westchester Co. Med. Ctr.*, 821 F.2d 111, 115 (2d Cir.), *cert. denied*, 484 U.S. 965, 108 S.Ct. 455, 98 L.Ed.2d 395 (1987)).

**6.** Fed. R. Civ. P. 56(e).

**7.** *E.g., Nora Beverages, Inc. v. Perrier Group of Am., Inc.*, 269 F.3d 114, 123–24 (2d Cir. 2001); *Nora Beverages, Inc. v. Perrier Group of Am., Inc.*, 164 F.3d 736, 746 (2d Cir.1998);

contending that the Sloan e-mail may not be considered on this motion because it is inadmissible hearsay.

"Hearsay" is defined as a "statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted."[8] The e-mail therefore contains two levels of potential hearsay. The first level is Sloan's statement to Riisna. The second is the statement Sloan attributed to "the company." Each either must be defined as non-hearsay under Rule 801 or come within one of the hearsay exceptions in order for the e-mail to be admissible in evidence to prove that ABC in fact refused to hire Riisna in consequence of her age discrimination claim.[9]

The first level of the hearsay analysis—the admissibility of the e-mail to the extent it is offered to prove that Sloan communicated its contents to Riisna—must be resolved in favor of plaintiff.[10] When Sloan sent the e-mail to Riisna, he was the executive producer of "20/20," someone who in ordinary circumstances plainly had authority with respect to the hiring of freelance producers. Thus, the statement, to the extent offered for that purpose, is an admission of a party opponent and, in consequence, not hearsay by virtue of Rule 801(d)(2)(D). ABC's contrary contention—which is based on the assertion that the decision not to hire Riisna was made by Marash—is without merit. Given that Sloan had initiated the possible hiring of

Riisna for the Barbara Walters program and communicated with Marash about it, it surely cannot be said that the statement was outside the scope of his employment. As this Court recently held, "statements regarding employment matters are within the scope of the declarant's employment if the declarant was 'an advisor or other significant participant in the decision-making process that is the subject ·matter of the statement.' "[11] In any case, given the sequence of events—the Sloan–Riisna conversation, Sloan's report to Marash, Marash's veto of the hiring of Riisna, and Sloan's communication of that decision to Riisna via the e-mail—the e-mail was a statement by an ABC agent (Sloan) authorized by ABC (in the person of Marash) to make a statement concerning the subject (the refusal to hire Riisna) and thus not hearsay by virtue of Rule 801(d)(2)(C).[12]

ABC's fallback position is that the statement attributed to "the company" (the second hearsay level) cannot be received for its truth because the e-mail's failure to identify the particular declarant who allegedly made the statement recounted in the e-mail prevents determination whether the person who purportedly made it was so situated as to render the statement admissible as a vicarious admission under Rule 801(d)(2)(D). Whatever merit the argument initially might have had, however, evaporated with the submission of the affidavit of Sloan that was included with ABC's reply papers.

Raskin v. Wyatt Co., 125 F.3d 55, 65–66 (2d Cir.1997).

**8.** Fed. R. Evid 801(c).

**9.** Id. 805.

**10.** The Court here addresses only the hearsay question, the only issue tendered by ABC. The question whether the e-mail would be relevant if it were not offered for the truth of "the company's" alleged statement to Sloan is not presented at this stage.

**11.** Evans v. Port Auth. of N.Y. and N.J., 192 F.Supp.2d 247, 263 (S.D.N.Y.2002) (quoting United States v. Rioux, 97 F.3d 648, 661 (2d Cir.1996)).

**12.** ABC's contention that Sloan, as he now says, gave Riisna a false reason in the e-mail to protect her feelings is an argument for the jury, not one the Court may accept on a motion for summary judgment.

Sloan's affidavit recounts his version of the initial conversation with Riisna, goes on to say that he consulted Marash about hiring her, and relates in substance that Marash had vetoed the hiring.[13] The affidavit thus establishes or, at least, permits the inference that the declarant who uttered the statement attributed to "the company" in the e-mail was Marash. There simply is no basis for contending—and ABC to its credit does not contend—that Marash's statement to Sloan is inadmissible hearsay. It quite clearly was a vicarious admission defined as non-hearsay by Rule 801(d)(2)(D).

The admissibility of the Sloan e-mail is sufficient to establish, for purposes of this motion, a *prima facie* case that the refusal to hire Riisna for the freelance job was retaliatory. ABC's half-hearted contention that there is no basis for concluding that Marash's explanation for his decision—that Riisna could not be associated with ABC product because she had been terminated for violations of ethical policy [14]—was pretextual lacks merit. Plaintiff is not obliged to prove that a defendant's proffered rationale for an adverse employment action is pretextual.[15] She is obliged only to establish that retaliatory animus made a difference in ABC's action.[16] The Sloan e-mail is sufficient to raise a genuine issue of material fact as to whether Riisna's protected activity made a difference in the decision.

### B. The Slander Claim

■ The complaint alleges that Victor Neufeld, then executive producer of "20/20," and other unnamed ABC employees slandered plaintiff by stating falsely that she had committed expense account and insurance fraud, traded a story for free surgery, sent threatening letters to Brennan and others on ABC stationery, taken trips to California paid for by ABC in order to threaten Brennan, and caused ABC to be liable to Brennan for huge sums of money. ABC seeks summary judgment dismissing these claims, arguing in essence that plaintiff cannot establish essential elements of her claim, *viz.* that the allegedly defamatory statements were made and, if so, that they were made with the scope of the speakers' authority.

■ Plaintiff's memorandum, Rule 56.1 statement and affidavit are silent as to the claim relating to Neufeld. This is not surprising, as plaintiff, in an extensive deposition of him, elicited absolutely nothing to support this aspect of her claim,[17] and she has offered no other evidence. Accordingly, this aspect of the defamation claim has been abandoned.

The alleged statements by other, unidentified ABC employees are a different matter. As plaintiff would have the burden at trial of proving that ABC made defamatory comments and ABC has challenged her ability to get to the jury on that point, plaintiff's burden now is to adduce evidence which, if credited, would permit a reasonable trier of fact to conclude that ABC made such statements.

■ Plaintiff has offered no direct evidence of any defamatory statement by anyone at ABC. Rather, she relies upon (1) ABC's statement that, if she did not re-

---

13. Sloan Reply Aff. ¶ 7.

14. *Id.*

15. *Gordon v. N.Y.C. Board of Educ.*, 232 F.3d 111, 117 (2d Cir.2000).

16. *Id.*

17. *E.g.*, Neufeld Dep. 192–96 (denying any conversations concerning Riisna's termination other than with counsel, a few identified senior management, and the co-anchor of the "20/20" show, none of which involved defamatory comments by Neufeld).

sign, she would be terminated for "gross misconduct" and that that would be known, and (2) the fact that she began hearing from various acquaintances allegedly false and defamatory accounts of her firing and the alleged reasons for it shortly after the May 24, 2000 meeting. She argues that the trier of fact therefore should be permitted to infer that ABC made substantially the assertions recounted to her by those with whom she spoke. ABC seeks dismissal of this claim on the ground that "plaintiff cannot even begin to establish the requisite elements of a slander claim because she has no admissible evidence that any defamatory statements of fact ever were made." [18]

Plaintiff's argument rests in the first instance on the premise that it is reasonable to infer that the rumors originated with ABC because of ABC's threat to disclose the reasons for her termination if she did not resign.[19] The argument rests on the principle, articulated prominently in *Mutual Life Insurance Co. v. Hillmon*,[20] that statements of intention to do an act are admissible to prove the later performance of the act, subject of course to the possibility that any unfair prejudicial effect of the evidence would outweigh substantially its probative value.[21] Thus, if ABC had stated an unqualified intention to disseminate information concerning the reasons for the separation of Riisna, that evidence would tend to show that it did so. But plaintiff is clear that there was no such unqualified statement. Quite the contrary. Her assertion is that ABC of-

fered her the opportunity to resign, suggesting that nothing would be said if she did so, and that the rumors began to fly "before my time to decide whether to resign from ABC had expired." [22] In consequence, the conditional threat made in the May 24, 2000, if threat it was, would not ground an inference that ABC followed through because the time that ABC had given Riisa to decide whether to resign had not expired before the rumors began to circulate. In other words, the time for determining whether the condition to ABC's threat would occur had not yet elapsed.

Once the inference based upon the alleged threat is removed, plaintiff is left with two categories of evidence in her effort to raise a genuine issue of material fact as to whether unnamed ABC employees made any defamatory statements: the suggestion that ABC was the only possible source and the rumors themselves.

The first suggestion is based on the premise that only plaintiff and ABC knew what had occurred on May 24, that plaintiff told only two co-workers, that neither of them repeated what she had told them before the rumors came back to plaintiff, and that ABC therefore must have been the source of the rumors. If plaintiff had offered evidence which, if credited, would permit a trier to conclude that ABC was the only possible source of the rumors, she would have a point. But there simply are too many holes in the argument to warrant a trial.

---

**18.** ABC Mem. 32.

**19.** To be sure, the statement is susceptible of a different construction, *viz.* that the circumstances of something like a termination for misconduct tend to become known even where the employer has no intention of relating them to anyone. But the Court is obliged to draw all reasonable inferences in plaintiff's favor for purposes of this motion, and the

inference set forth in the text would be a reasonable one.

**20.** 145 U.S. 285, 12 S.Ct. 909, 36 L.Ed. 706 (1892).

**21.** 5 Joseph M. Mclauglin, Weinstein's Evidence § 803.07 (2d ed.2002).

**22.** Riisna Aff. ¶ 51.

To begin with, the fact that plaintiff no longer was working at ABC after May 24 was open and notorious, and the likelihood that she simply would have walked out slim. Plaintiff's affidavit and the cited portions of her deposition do not exclude the possibility that she told others of ABC's inquiry and the reasons for it prior to the May 24 meeting. A simple process of putting two and two together once Riisna's absence became known could well have accounted for the rumors.

■ Nor has plaintiff adduced evidence that, if credited, would exclude the possibility that she gave an account of the May 24 meeting to one or more individuals, who repeated the tale to others. While she so maintained at oral argument, and her brief so implied, the evidence upon which she relies for that proposition simply does not bear out the claim. Her affidavit is silent on the point. The brief is careful to say that she discussed the circumstances "with two people" who did not repeat what she had said—not with "only two people."[23] And the deposition testimony she cites makes clear that this is not an overly technical reading of her memorandum—plaintiff did not say that she told no one else anything about what was going on.[24]

But all of this ultimately is unnecessary to decide the point. The rumors, even if admissible for the purpose of demonstrating that the witness's source made the statements and not for their truth, in no instance have been traced back to anyone at ABC. Even if it were logical to infer that *something* came from ABC, it would not be logical to infer that each rumor, in the form it reached the witness, in words or substance was what originated with ABC. In other words, there still would be no evidence as to what ABC said, as distinguished from what some second-, third-, fourth- or nth hand recipient heard or how some such intermediary construed or elaborated upon it.

Plaintiff is perfectly correct in suggesting that the fact of publication of a defamatory statement may be proved circumstantially.[25] But plaintiff here seeks to prove circumstantially not only the fact of publication, but the content of the alleged defamatory statement. And while the Court is not prepared to say that circumstances never could arise in which that would prove possible, this is not such a circumstance.[26] There are too many links between any statement by ABC, if any there were, and whatever came back to plaintiff or her informants to permit a rational inference that whatever the plaintiff or her informants heard was what ABC said.[27]

23. Pl. Mem. 33.

24. Riisna Dep. 156–60, 174–76.

25. *E.g.*, 1 ROBERT D. SACK, SACK ON DEFAMATION § 2.5.1, at 2–76 to 2–77 (3d ed.2001); *see James v. DeGrandis*, 138 F.Supp.2d 402, 420–21 (W.D.N.Y.2001) (denying summary judgment on libel claim where defendant threatened to send defamatory letter and anonymous defamatory letter was sent).

26. *But cf.* SACK, § 2.5.1, at 2–76 (content of alleged defamatory statement may not be proved "purely through hearsay").

27. The same result may be reached under FED. R. EVID. 403. Even assuming, *arguendo*, that plaintiff's rumors were admissible over hearsay objection, the Court would exclude them under that rule. The risk of unfair prejudice inherent in using rumors circulating at unknown remove even from a known source to prove the content of the source's statement simply and substantially outweighs any probative value. Moreover, there would be a substantial risk of jury confusion and considerable waste of time, as ABC as a practical matter could be forced, wherever possible, to call every person in the chain down which a given rumor traveled in an effort to show that all or part of each rumor that eventually got back to plaintiff did not originate with ABC.

*Conclusion*

For the foregoing reasons, defendants' motions for summary judgment dismissing the complaint are denied save that ABC's motion to dismiss plaintiff's defamation claim is granted.

SO ORDERED.